UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| TRAVIS MAXWELL, | ) |
| Plaintiff, | ) |
| vs. | ) No. 1:10-CV-78 (CEJ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

**I. Procedural History**

On December 13, 2005, plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq., and an application for supplemental security income disability benefits under Title XVI of the Act, 42 U.S.C. §§ 1391 et seq. (Tr. 32-33). Plaintiff claims he is unable to work due to mental retardation, bipolar disorder, hepatitis C, manic depression with suicidal thoughts and difficulty concentrating with an onset date of March 1, 1992.[1] (Tr. 147). After plaintiff's applications were initially denied by defendant on March 14, 2006, (Tr. 394), he requested a hearing before am Administrative Law Judge ("ALJ"). Id.

---

[1]Plaintiff was born on June 18, 1982. (Tr. 9). His mother applied for and received supplemental security income benefits on his behalf beginning on March 23, 1992 for disability due to mental retardation. (Tr. 38-43). Defendant later determined that plaintiff was not disabled and terminated his benefits as of July 15, 1997. Id. After a hearing, an ALJ affirmed the denial of benefits on May 20, 1999 and the Appeals Council affirmed this decision on August 15, 2001. (Tr. 394).

The hearing was held on August 29, 2007. (Tr. 7). Plaintiff was represented by counsel at the hearing. Id. The ALJ heard testimony from plaintiff and from a vocational expert. After the hearing, the ALJ asked plaintiff to submit to a psychological evaluation. (Tr. 28). Plaintiff submitted additional medical records, including the requested psychological evaluation report, on October 29, 2007. (Tr. 395). The ALJ issued a decision denying plaintiff's claims on March 25, 2008. (Tr. 391-403). The Appeals Council denied plaintiff's request for review on March 26, 2010. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Background and Employment History

At the time of the administrative hearing, plaintiff was 25 years old, single, and lived with his mother. (Tr. 9). Plaintiff has three children, but they were adopted by a relative after their mother died in October 2006. (Tr. 16). Plaintiff testified that he rarely sees the children since their mother's death. (Tr. 18). He testified that he did not consider himself capable of caring for the children on his own.

Plaintiff completed the ninth grade and did not have a GED. While in school, he had been in special education classes. Plaintiff testified that he could not do simple arithmetic and that he could "barely read at all." (Tr. 13-14). Plaintiff was able to obtain his driver's license by taking an orally-administered test. However, he lost his license due to a DWI conviction. Plaintiff received supplemental security income for child disability between March 1, 1992 and July 15, 1997 based upon mental retardation. (Tr. 38). His benefits were terminated in July of 1997 because it was determined that he was no longer disabled under the newly amended standards for

mental impairments set forth in 20 C.F.R. Part 404, Subpart P, 20 C.F.R § 416.924. (Tr. 38-42). This decision became final on August 15, 2001. (Tr. 394).

Plaintiff testified that his last job was as a grain bin builder. He quit the job two months before the hearing after being employed for about one month. He testified that he stopped going to work because he became nervous about people making fun of him or talking about him. (Tr. 12-13). Plaintiff testified about other jobs he'd held doing manual labor (*i.e.*, digging ditches, factory work, construction laborer). All of his periods of employment were of short duration, with the longest being six months. (Tr. 12-13, 19-23, 103, 325). Plaintiff testified that he was physically able to work, but that he could not handle being around people and the stress of working. (Tr. 25).

At the hearing, plaintiff testified that he drank alcohol "when I get stressed or when something happens, you know, in my life." (Tr. 16). He testified that he last drank alcohol in October 2006 after the mother of his children died. He also testified that he had not used cocaine or marijuana since then. (Tr. 16-17)

Plaintiff testified that he stays in his room most of the time, but he sometimes visits a friend's home to watch movies. He does some household chores, such as vacuuming, washing dishes and taking out the trash. (Tr. 23-24).

At the administrative hearing, the ALJ also heard testimony from John E. Grenfeld, Ph.D., a vocational expert. In the hypothetical question posed to Dr. Grenfeld, the ALJ described an individual of plaintiff's age, education and work experience who could not read, write, or do math and was moderately limited in eight of the twenty mental factors described in a March 13, 2006 psychological assessment.[2]

---

[2]The Mental Residual Functional Capacity Assessment (Tr. 283-285) is discussed below at pp. 6-7.

Dr. Grenfeld opined that the hypothetical individual would be able to perform plaintiff's past relevant work. (Tr. 26-28).

B.   Education and Medical History

School records show that plaintiff was found to have a full-scale IQ of 79 in 1989, at the age of seven. (Tr. 180). According to the May 20, 1999 decision terminating plaintiff's child disability benefits, George DeRoeck, Psy. D., examined plaintiff in September 1997 and determined that plaintiff had a verbal IQ of 67 and full scale IQ of 68. (Tr. 40). The ALJ noted that Dr. DeRoeck evaluated plaintiff again in January of 1998 and diagnosed a reading disorder. Id. The school records also indicate that plaintiff consistently scored in the bottom tenth percentile on standardized tests and that he was enrolled in special education classes. (Tr. 171-82). Plaintiff had a "B" average for both semesters of reading and math during his eighth grade year. (Tr. 172).[3]

Plaintiff was admitted to the hospital on March 28, 2004 after he got into an altercation. (Tr. 222). Hospital records state that plaintiff hurt his right hand during the fight, his right foot due to kicking a car, and that he cut his right forearm because he was angry. Id. It was determined plaintiff did not have any fractures, and he was treated and released. Id.

Plaintiff was again admitted to the hospital on June 30, 2005 with fever, headache and chills. (Tr. 197). Plaintiff was diagnosed with hepatitis C;[4] he was

---

[3]There are no school records for plaintiff after eighth grade.

[4] "Hepatitis C is a contagious liver disease that results from infection with the Hepatitis C virus . . . most people become infected with the Hepatitis C virus by sharing needles or other equipment to inject drugs." Center for Disease Control and Prevention, "Hepatitis C," http://www.cdc.gov/hepatitis/C/index.htm (last visited Aug. 10, 2011).

-4-

treated and released. (Tr. 197). Samuel Burchfield, M.D., the treating physician, noted that plaintiff drank alcohol and smoked a half a pack of cigarettes per day. (Tr. 200).

A viral hepatitis case report was filed with the Centers for Disease Control and Prevention. (Tr. 260). This report noted that plaintiff exhibited symptoms of acute hepatitis[5] during his June 30, 2005 hospitalization. (Tr. 258). The report further states that plaintiff has had 9 different sexual partners during his lifetime, with two to five of them in the last 6 months. (Tr. 261-62). It was also reported that plaintiff had used illegal intravenous drugs in his lifetime, but not in the preceding 6 months. He had used non-intravenous street drugs in the preceding 6 months. Id. It appears that this information was provided by plaintiff.

Plaintiff was again admitted to the hospital on July 17, 2005 with depression and suicidal ideation. (Tr. 237). When admitted, plaintiff reported that he had drunk eight beers that day and smoked marijuana. The intake report notes that plaintiff smelled strongly of alcohol. (Tr. 234). Plaintiff was diagnosed with acute alcohol intoxication, polysubstance abuse, and mood disorder secondary to polysubstance abuse. (Tr. 239). Plaintiff was discharged on July 19, 2005. Plaintiff had a Global Assessment of

---

[5] "Hepatitis C can be either "acute" or "chronic." Acute Hepatitis C virus infection is a short-term illness that occurs within the first 6 months after someone is exposed to the Hepatitis C virus." Center for Disease Control and Prevention, "Hepatitis C," http://www.cdc.gov/hepatitis/C/index.htm (last visited Aug. 10, 2011).

Functioning (GAF)[6] score of 35[7] when admitted, and a GAF score of 70[8] at the time of discharge. (Tr. 239, 242). It was noted that plaintiff had improved during his brief hospitalization. He was given samples of Seroquel[9] and Zoloft[10] when discharged and was directed to stay away from drugs and alcohol. (243). In the discharge report, the treating physician, Edilberto Lorenzo, M.D., wrote that the "patient is capable of working and no significant evidence of psychiatric condition to warrant this patient not be gainfully employed." (Tr. 239-40).

A Mental Residual Functional Capacity Assessment of plaintiff was completed by consultant Joan Singer, Ph.D., on March 13, 2006 in connection with plaintiff's application for disability benefits. (Tr. 269). Dr. Singer's report indicates that plaintiff

---

[6] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).

[7] A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[8] A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[9] Seroquel is indicated for the treatment of acute manic episodes associated with bipolar I disorder and schizophrenia. See Phys. Desk Ref. 691 (61st ed. 2007).

[10] Zoloft, or Sertraline, is a member of the SSRA class and is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. It is also used to relieve the symptoms of premenstrual dysphoric disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

was only moderately limited in eight of twenty functional categories and not significantly limited in the remaining twelve. (Tr. 283). The report also notes that plaintiff had previously been diagnosed with bipolar disorder. At the time of the evaluation, however, plaintiff was able to care for his personal needs, perform some household tasks and prepare simple meals, and enjoyed fishing and swimming and socializing with one friend. (Tr. 285). Most of plaintiff's complaints at the time of the evaluation were of physical, not mental, problems. Dr. Singer noted that plaintiff was unable to read well or to spell or write, and that he was "very hostile and can't be around others." Id. Finally, Dr. Singer concluded that plaintiff had no physical limitations and could perform simple repetitive tasks away from the public. Id.

Plaintiff had an accident while riding a dirt bike on June 17, 2007 and was admitted to the hospital. (Tr. 379). The initial assessment form indicates plaintiff suffered a mild shoulder injury. Id. He was given a shoulder cast and sling to immobilize the injury and released that same day. (Tr. 383).

At the ALJ's request, plaintiff submitted to a consultive psychological examination by a licensed psychologist, Paul Rexroat, Ph.D., on October 5, 2007. (Tr. 324). Dr. Rexroat determined plaintiff had a verbal scale IQ of 68 and full scale IQ of 64. (Tr. 327). Dr. Rexroat administered a Minnesota Multiphasic Personality Test, but plaintiff answered the questions randomly, without regard to content, and thus, the test results were likely invalid. (Tr. 329). Plaintiff reported that he used to smoke marijuana, had used methamphetamine once, and that he drank about a six-pack of beer each week. Id. The report further states that plaintiff was admitted to the hospital two weeks before the evaluation due to an overdose, but no further details related to this incident are in the record. (Tr. 326). Based on his observations, Dr.

Rexroat diagnosed plaintiff with mild mental retardation, bi-polar disorder, and cannabis dependence in remission one year. (Tr. 331). Dr. Rexroat assigned plaintiff a GAF score of 51[11] at the October 5, 2007 evaluation. (Tr. 332).

Plaintiff was again admitted to the hospital on December 16, 2007. (Tr. 357). Nikolay Horozov, M.D., diagnosed plaintiff with opioid dependence, alcohol abuse, social phobia, and it was noted that plaintiff had a long history of drug use. (Tr. 358). Specifically, Dr. Horozov's report states that plaintiff has "a long history of intravenous opiate use and [plaintiff] stated that he has been injecting OxyContin,[12] Dilaudid,[13] and Morphine for the past seven years on a daily basis." (Tr. 358) (footnotes added). Plaintiff reported that he injected approximately 160 mg of OxyContin on average per day and that he obtained the drug from a man who had a valid prescription for it. (Tr. 358). Upon admission to the hospital, plaintiff was assigned a GAF score of 35, but was determined to have GAF score of 70 at the time of discharge. (Tr. 357). When given the choice between full detoxification or maintenance treatment with Suboxone,[14] plaintiff opted for the Suboxone treatment. Id. He was prescribed Suboxone and

---

[11]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[12]OxyContin. Oxycodone hydrochloride is indicated for management of moderate to severe pain when a continuous round-the-clock opioid analgesic is needed for an extended period. It is not for use on an as-needed basis. See Phys. Desk. Ref. 2879-80 (65th ed. 2011).

[13]Dilaudid is a hydrogenated ketone of morphine indicated for management of pain. Phys. Desk. Ref. 2873-74 (65th ed. 2011).

[14]Suboxone, a combination of buprenorphine and naloxone, is used to treat opioid dependence. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605002.html (last visited on Mar. 9, 2011).

reported greatly improved mood with no symptoms suggestive of opioid withdrawal at discharge. (Tr 357).

Plaintiff went to the emergency room of Twin Rivers Regional Medical Center on January 5, 2009, complaining of abdominal pain, nausea, vomiting, and yellowing of the eyes. (Tr. 337-356). Upon admission, plaintiff reported a history of alcohol abuse and cigarette smoking, but he denied illicit drug use. (Tr. 348). During his hospitalization, plaintiff was seen by Mona Tomescu, M.D. (Tr. 343). Plaintiff reported that he had a history of "significant alcohol consumption" that included drinking as much as a 30-pack of beer per day for the last two or three years and an alcoholic binge during the Christmas holiday. Id. Plaintiff told Dr. Tomescu that he had recently reduced his alcohol consumption to an average of two beers per day. Id. Dr. Tomescu's notes do not contain any mention of plaintiff's history of drug abuse. Plaintiff was discharged on January 12, 2009, with diagnoses acute alcoholic hepatitis over post-hepatitis C, gallbladder disease, chronic alcoholism, and chronic headaches. Id. Plaintiff was again told to refrain from alcohol consumption and was given a prescription for oxycodone for pain. (Tr. 338).

### IV. The ALJ's Decision

In the decision issued on March 25, 2008, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through June 30, 2011.

2. Plaintiff engaged in substantial gainful activity from May 21, 1999 through the end of 2006. The claimant did not perform substantial gainful activity beginning on January 1, 2007.

3. Plaintiff has the following impairments, which in combination are severe: possible mild mental retardation and bipolar disorder (20 CFR 404.1520(c) and 416.920(c)).

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, plaintiff has the residual functioning capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He cannot perform work that requires he be able to read, write, or do math. He can only perform work that requires he perform no more than simple, one- or two-step instructions, and he has moderate limitations to his ability to maintain attention and concentration for extended periods or to work at a consistent pace without unreasonable number and length of rest periods. He is limited to no more than moderate interaction with other coworkers, supervisors, or the general public.

6. Plaintiff is capable of performing his past relevant work as a laborer. This work does not require performance of work-related activities precluded by the plaintiff's residual functioning capacity.

7. Plaintiff has not been under a disability, as defined in the Social Security Act, from May 21, 1999 through the date of this decision.

8. Plaintiff is found to be not disabled; therefore, an examination of the materiality of his alcohol consumption is unnecessary.

(Tr. 394-403). The ALJ also determined that the issue as to whether plaintiff was disabled due to mental retardation for the time period from March of 1992 to July of 1997 was precluded on res judicata grounds by the decision to terminate plaintiff's child disability benefits, which became final on August 1, 15, 2001. (Tr. 394).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989).  The ALJ first determines whether the claimant is engaged in substantial gainful activity.  If the claimant is so engaged, he is not disabled.  Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act.  Fourth, the ALJ determines whether the claimant can perform his past relevant work.  If the claimant can, he is not disabled.  Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy.  If the claimant is not, he is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

A.  **Standard of Review**

The district court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d

185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

B. **Analysis**

Plaintiff alleges the following errors by the ALJ warrant remand or reversal: (1) ALJ incorrectly determined that plaintiff was not disabled under the criteria in listing 12.05(c) by failing to afford proper weight to Dr. Rexroat's diagnosis of plaintiff's cognitive functioning and mental health conditions in evaluating the 12.05(c) elements; (2) the ALJ's determination that plaintiff possessed the Residual Functioning Capacity (RFC) to return to his past work was not supported by substantial evidence and was also contrary to Dr. Rexroat's evaluation; and (3) the ALJ improperly determined that plaintiff's testimony about his limitations was not credible.

### 1. Disability Under Listing 12.05(c) Criteria

A claimant is considered disabled due to mental retardation if he or she meets the criteria set forth in 12.05(c). 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(c). To qualify as presumptively disabled due to mental retardation under 12.05(c), substantial evidence must support the presence of a "valid verbal, performance, or full scale IQ of 60 through 70" and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id.; Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir.2006) (describing the § 12.05(c) requirements). The onset of both the mental retardation and the additional limitation must have occurred during the developmental stage, i.e., prior to the age of 22. Id. A formal diagnosis of mental retardation is not required to satisfy Listing 12.05(c) and the Commissioner need not rely exclusively on IQ scores and may disregard test scores that are inconsistent with the record. Id. at 899; Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir.2001); Clark v. Apfel, 141 F.3d 1253, 1255-56 (8th Cir.1998) (holding that the ALJ properly rejected IQ scores in the mid-60s as meeting the first requirement of Listing 12.05(C) where,

among other things, scores were based on a one-time examination by a non-treating psychologist and no other physician ever found that the claimant was retarded).

As to the first prong of 12.05(c), plaintiff argues that the ALJ's determination that he does not have a valid verbal, performance, or full scale IQ of 60 through 70 is not supported by substantial evidence. Specifically, plaintiff claims that the ALJ improperly discounted Dr. Rexroat's October 2007 evaluation determining plaintiff to have an IQ of 64-68 in favor of a school record showing plaintiff to have an IQ of 79 in 1989 when plaintiff was 7 years old. The Court agrees that substantial evidence does not support the ALJ's conclusion. Although it was not discussed by the ALJ or brought up by either party, plaintiff underwent a psychological evaluation in 1997 that found that he had a verbal IQ of 67 and a full scale IQ of 68. (Tr. 40). The evaluating physician, Dr. DeRoeck, examined plaintiff on more than one occasion as he diagnosed plaintiff with a reading disorder in 1998. Id. Generally, a treating physician's opinion is given deference over those of one-time, consulting physicians. Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992). Thus, while the ALJ may have been able to discount an IQ score from an evaluation when plaintiff was seven years old, this more recent score, determined when plaintiff was 15 years old by a treating physician, cannot be ignored. See Maresh, 438 F.3d 897 (a person's IQ is presumed to remain stable over time); 20 CFR Pt. 404, Subpart P, App. 1 § 112.00(D)(10) (Generally, scores of IQ tests tend to stabilize by the age of 16). Finally, Dr. DeRoeck's evaluation was made prior to plaintiff's history of drug and alcohol abuse, is consistent with the IQ scores assessed in Dr. Rexroat's October 2007 report, and establishes that plaintiff's cognitive deficiency manifested prior to the age of 22. Cf. Muncy, 247 F.3d 728, 733 ("[a]n ALJ may disregard a claimant's IQ score when it is derived from a one-time

examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior.").

As to the second prong of 12.05(c), the ALJ determined that plaintiff did not have "a physical or other mental impairment imposing an additional and significant work-related limitation of function," whose onset had occurred by age twenty-two. McNamara v. Astrue, 590 F.3d 607 (8th Cir. 2010) (internal citations omitted). The Court finds this determination is supported by substantial evidence in the record. The additional limitation required by 12.05(c) "need not be disabling, but it must have a 'more than slight or minimal effect on [plaintiff's] ability to perform work.'" Id. at 611 (quoting Sird v. Chater, 105 F.3d 401, 403 (8th Cir.1997)). Plaintiff testified that he has no physical impairments that would preclude him from working or that would impose any additional limitations on his employment. (Tr. 25). In addition, nothing in the record suggests that plaintiff is physically limited in his ability to work. Plaintiff argues that his bipolar disorder and hepatitis C condition should be considered as additional impairments that are more than slight or minimal. However, neither of these conditions necessarily results in an additional limitation that has more than a slight or minimal effect on plaintiff's ability to perform work as required by 12.05(c). This conclusion is supported by Dr. Singer's report noting only moderate limitations in eight of twenty functional categories in combination with the vocational expert's testimony that these eight limitations would not be more limiting then plaintiff's mild mental retardation. (Tr. 27).

In addition, the ALJ's decision that none of plaintiff's additional limitations-- hepatitis C, drug and alcohol abuse, and depression--manifested before plaintiff was 22 years old is supported by substantial evidence. The first episode of decompensation

evidenced by the record occurred in 2005 as did the onset of plaintiff's hepatitis C. In addition, plaintiff's employment history, including his earnings of $10,639[15] during 2006, support the conclusion that his additional impairments did not result in any significant limitations that are more than slight or minimal prior to age 22.

Although the Court finds that the ALJ's finding that plaintiff does not have an IQ between 60 and 70 is not supported by substantial evidence, the ALJ's determination that plaintiff does not suffer from an additional significant limitation, whose onset occurred before 22 years of age, is supported by substantial evidence. As a result, plaintiff has not satisfied both requirements of listing 12.05(c) and is not disabled as a matter of law. See McNamara, 590 F.3d 607.

### 2. Plaintiff's Ability to Perform Past Work

Plaintiff next claims that the ALJ incorrectly determined that plaintiff possessed the Residual Functioning Capacity (RFC) to perform his past work. A claimant's RFC is what he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). Further, a claimant's RFC is a medical question. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. Id. The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). Nonetheless, the RFC

---

[15]This would correspond to approximately 2065 hours worked during 2006 at Missouri's minimum wage in 2006, which was $5.15 per hour. See http://labor.mo.gov/DLS/minimumwage/.

-16-

determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.' " Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir. 2000)).

Here, the ALJ's determination of plaintiff's RFC is supported by substantial evidence. In describing plaintiff's RFC to the vocational expert, the ALJ specifically referred to the eight moderate limitations listed in Dr. Singer's report. Further, the ALJ described someone who could not read, write, or do math. Based upon this description, as well as the vocational expert's assessment of plaintiff's past work, the vocational expert testified that plaintiff could return to his past work. Contrary to plaintiff's assertion, the vocational expert's testimony is substantial evidence because it was based upon a description of limitations that is supported by the record. Cf. Cox v. Astrue, 495 F.3d 614 (8th Cir. 2007) ("Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.").

Plaintiff argues the ALJ improperly discounted Dr. Rexroat's report, which described some of plaintiff's limitations as more severe than moderate. This is not the case. First, Dr. Rexroat, a one-time consulting physician, determined that plaintiff exhibited signs of malingering during the examination, which undermines the results of the evaluation. Further, the record shows significant portions of the information plaintiff reported to Dr. Rexroat was false. Specifically, while the medical records indicate that plaintiff was using drugs and binge drinking at the time, plaintiff failed to report this information to Dr. Rexroat. The record also shows that plaintiff's activities are much less limited than he described to Dr. Rexroat and included swimming, fishing,

dirt biking, using and selling drugs, and engaging in sexual relations with numerous partners. Contrary to Dr. Rexroat's description of plaintiff's limitations, both Dr. Singer and Dr. Lorenzo, a treating physician, opined that plaintiff is mentally capable of handling the rigors of employment. (Tr. 240, 283). Finally, although Dr. Rexroat assigned plaintiff a GAF score of 51, two separate treating physicians determined plaintiff to have a GAF score of 70 after observing plaintiff during multi-day hospital stays.

It is the ALJ's function to resolve conflicts among "the various treating and examining physicians." Bently v. Shalala, 52 F.3d 784 (8th Cir. 1995) (internal citation omitted). Further, treating physicians are generally afforded greater deference then consulting physicians. Thompson, 957 F.2d at 614. Thus, based upon the record and the informed testimony of a vocational expert, the ALJ's determination of plaintiff's RFC and conclusion that he could return to his past work is substantially supported.

3.   **Credibility of Plaintiff's Testimony**

Lastly, plaintiff argues that the ALJ was incorrect in finding plaintiff's testimony about his limitations not credible. The Court disagrees. "If an ALJ explicitly discredits a claimant's testimony and gives good reason for doing so, we will normally defer to that judgment." Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). As discussed above, the record shows that plaintiff gave testimony at the August 2007 hearing that is inconsistent with the record and inaccurately described his limitations as well as their causes. Further, plaintiff's failure to seek medical treatment for his mental conditions and adhere to his doctor's recommendations, while showing no hesitation to seek medical treatment for physical ailments, is a valid basis for discounting plaintiff's subjective mental impairments. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir.

1999). As such, the ALJ's discounting of plaintiff's testimony about his daily activities and subjective limitations is supported by substantial evidence.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [Doc. #17] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of August, 2011.